UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff<br><br>v.<br><br>Jairo Garcia,<br><br>                    Defendant | Case No. 2:21-cr-00224-CDS-VCF-1<br><br>**Order Granting Motion to Suppress, Sustaining Objection, and Rejecting the Magistrate Judge's Recommendation**<br><br>[ECF Nos. 27, 67, 68] |

Defendant Jairo Garcia was indicted under 18 U.S.C. §§ 922(g)(1) and 924(a)(2) for being a felon in possession of a firearm. He moves to suppress the firearm, contending that law enforcement violated his Fourth Amendment right to be free from unlawful searches and seizures when officers stopped him and ultimately discovered the weapon while responding to 911 calls about a domestic dispute.[1] The magistrate judge held an evidentiary hearing in June of this year and heard testimony from the two responding officers and the defendant's mother, who witnessed the encounter. In August, the magistrate judge issued a report and recommendation (R&R) in which he recommends that I deny Garcia's motion to suppress because the officers had reasonable suspicion to detain Garcia so they could assess his potential involvement in the domestic dispute. Garcia objects to the R&R, arguing that the officers lacked particularized suspicion of Garcia and that the firearm was thus fruit of the poisonous tree and must be suppressed. The government opposes the objection and urges me to adopt the magistrate judge's

---

[1] Garcia's motion also seeks to suppress statements that he gave to law enforcement before and after being Mirandized, but the parties have stipulated that the portion of the motion to suppress Garcia's statements is moot. Resp. Br., ECF No. 34 at 1, 15–16; Reply Br., ECF No. 40 at 2; Hr'g Tr., ECF No. 61 at 8–9. I adopt the magistrate judge's decision from the evidentiary hearing to deny Garcia's motion to suppress as to the statements only. *See* ECF No. 61 at 8–9. The bulk of this order addresses Garcia's motion with respect to the firearm.

recommendation.

I have conducted a de novo review of the parties' various briefs, the evidentiary hearing transcript, the exhibits (including body-worn camera (BWC) footage of the incident), the magistrate judge's R&R, and relevant caselaw. Recognizing the delicate balance that courts must strike between preserving officer safety and respecting individuals' rights to be free from unlawful searches and seizures, based on the record before the court, I conclude that the officers lacked reasonable suspicion to temporarily detain Garcia. The stop and subsequent search were therefore unconstitutional. So I sustain Garcia's objection to the magistrate judge's R&R, reject the recommendation, and grant Garcia's motion to suppress the firearm.

I. Background[2]

On Christmas Eve of 2020, 911 received two calls from the same apartment building—one from unit 3 and the other from unit 4—on Carey Avenue in North Las Vegas. ECF No. 28, Exs. A, B. The first call was from a Spanish-speaking man in unit 3, reporting a domestic dispute. *Id.*, Ex. A. The man—later identified as Garcia's uncle, Humberto—explained through an interpreter to the 911 dispatcher that his niece had just thrown a can at his back, striking him. *Id.* at 4:09.[3] He declined medical attention. *Id.* at 4:27. He identified his niece as a white 23-year-old female and described that she was wearing a black shirt and black pants. *Id.* at 3:35, 3:48, 3:55. The dispatcher asked if there were any weapons involved in the disturbance, and Humberto said no. *Id.* at 4:50. After obtaining Humberto's address and confirming the apartment number, the 911 dispatcher explained that officers would be sent over shortly. *Id.* at 5:01.

Soon after, 911 received a second call from an American Medical Response (AMR) dispatcher who asked if 911 had already received a call about the Carey Avenue address, and the 911 dispatcher confirmed that it had. *Id.* at 0:06. The 911 dispatcher asked, "on a domestic?" ECF

---

[2] These facts are primarily derived from my observations of the footage recorded by the officers' BWC and the witness testimony given during the evidentiary hearing. *See* ECF No. 28 (notice of manual filing of CD); ECF No. 61.

[3] The timestamps listed throughout this section are the approximate starting points of the referenced audio and video segments.

No. 31-1, Ex. B at 0:11. The AMR dispatcher responded, "no," explaining that AMR had received a "911 disconnect" call from someone at the same address on Carey Avenue, but in apartment 4—not 3. *Id.* at 0:13, 0:23, 0:37. The AMR dispatcher stated that the caller did not provide further information before disconnecting. *Id.* at 0:57. The AMR dispatcher also noted that officers should "proceed with caution," but did not know why. *Id.* at 0:53, 1:10. The 911 dispatcher explained that "we got it as a domestic" and stated that "we do have a call; we'll go out there as soon as we can." *Id.* at 0:17, 1:13. The 911 dispatcher then relayed this information to officers. Both responding officers testified that 911 conveyed to them that there was a domestic dispute between a man and his 23-year-old niece, and they both knew that the aggressor was female. ECF No. 61 at 27, 63–64, 123, 138–39. They had also been informed that there were two calls—one from the uncle and one disconnect. *Id.* at 27–28, 123. But it is unclear from the record whether the 911 dispatcher informed the officers that based on the disconnected call, they should proceed with caution.[4]

North Las Vegas Police Department (NLVPD) Officer Christopher Colwell was the first to respond, and when he arrived on the scene, he was "[b]riefly alone" before another officer arrived. *Id.* at 31. Colwell arrived in his marked police vehicle and was wearing a police uniform equipped with a functional BWC. *Id.* at 30–31, 52, 61. The second NLVPD officer, Saul Macias, arrived at the scene shortly after Colwell. *Id.* at 126–28. Macias, too, arrived alone in his own marked police vehicle and was also wearing a police uniform.[5]

---

[4] During the evidentiary hearing, the government conclusorily stated that the officers "were advised during the course of that 911 call to proceed with caution." ECF No. 61 at 12. But the record is not clear whether this occurred, and neither officer testified that he was told that information or knew that before responding to the scene. Even the declaration of arrest that Colwell completed on the day of the incident does not reference this information. *See* ECF No. 27-1 at 2 ("Dispatch advised American Medical Response Dispatch (AMR) received a separate 911 disconnect coming from apartment #4. It was unknown if the two calls were related.").

[5] Macias's BWC malfunctioned and did not capture video footage of the encounter with Garcia. ECF No. 61 at 48:58. The only BWC footage provided to the court is that from Colwell (ECF No. 28, Ex. C); a supervisor who later arrived at the scene, Officer Wall (ECF No. 28, Ex. E); and a third officer whom the parties do not identify (ECF No. 28, Ex. F). The primary BWC upon which I rely is Colwell's because his

Colwell testified that before he turned on his BWC, he heard arguing coming from the courtyard in front of the Carey Avenue apartment building but could not tell who was arguing with whom. *Id.* at 36. He saw Garcia holding a young child in his arms and walking away from the courtyard, along with an adult man and an adult woman inside of the courtyard. *Id.* at 43–44. Colwell told Garcia to go into the courtyard, and Colwell testified that Garcia complied with that request. *Id.* at 44, 88–89.[6] Colwell did not turn on his BWC until he had already exited his vehicle and was approaching the apartment courtyard. *Id.* at 52, 66–67.

The first part of the footage—once the camera was turned on—shows Garcia standing outside of the fenced-in courtyard in front of the apartment building, holding a young child in his arms. ECF No. 28, Ex. C at 0:00:01. This was presumably after Colwell had instructed Garcia to go into the courtyard. As Colwell approached him, Garcia took a few steps and walked through a gate and inside of the courtyard. *Id.* As Garcia walked, he said, "I didn't call." *Id.* Colwell then asked, "what unit do you live in, brother?" *Id.* at 0:00:03. Garcia continued walking into the courtyard and replied, "I don't live here." *Id.* at 0:00:04. He did not stop walking. Colwell then said, "alright, stay right here. Why do you keep walking away? Stop! Stop!" *Id.* at 0:00:05–0:00:10. Garcia was a few feet in front of Colwell. Around this time is when Officer Macias approached as well. ECF No. 61 at 128. Macias testified that as he approached, he heard Colwell giving Garcia commands. *Id.* And Macias followed Colwell into the apartment building's courtyard. *Id.* at 132. Macias also testified that he "didn't think [they] had anything on him" "when Officer Colwell started chasing him." *Id.* at 142.

Within ten seconds of encountering Garcia, the officers had their hands on him, holding his arms behind his back. ECF No. 28, Ex. C at 0:00:10. Around 30 seconds into the encounter, Garcia began to struggle with the officers. While Garcia's hands were being held behind his

---

is the footage that captures the officers' initial encounter with Garcia, along with the stop and arrest. ECF No. 28, Ex. C.

[6] Nothing up to this point was captured on Colwell's BWC. ECF No. 61 at 52, 66–67. Officer Macias testified that he was not present during the initial encounter between Colwell and Garcia. *Id.* at 146.

back, Colwell said that Garcia was going to run, and Garcia said, "no, I'm not." *Id.* at 0:00:30. Macias used a "balance displacement maneuver" to get Garcia face-first on the ground. *Id.* at 0:00:52; ECF No. 61 at 49, 57–59, 93–94, 112, 134. While Garcia was resisting—by pushing his shoulders forward and moving his arms—the officers handcuffed his hands behind his back. ECF No. 28, Ex. C at 0:01:13. During the struggle, the officers told Garcia to stop resisting and warned that he would go to jail for resisting if he did not stop. *Id.* at 112. And Garcia protested, "It was my sister, dude." *Id.* at 0:01:06.[7] And once he was handcuffed and was being guided toward a patrol car, Garcia said, "Help my sister. Help my sister please." *Id.* at 0:01:30. Once Colwell, Macias, and Garcia arrived at the patrol car, the officers conducted a pat-down search of Garcia and recovered a gun from his waistband. *Id.* at 0:02:17. I do not rely upon or address the remaining fifty-four or so minutes of Colwell's BWC footage, as it is not relevant to my resolution of the motion to suppress.[8]

## II.   Legal standard

A district court's review of a magistrate judge's order on a pretrial matter is governed by 28 U.S.C. § 636. Magistrate judges are authorized to resolve pretrial matters as long as their ruling is not "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); see also Fed. R. Crim. P. 59; LR IB 3-1(a) ("A district judge may reconsider any pretrial matter referred to a magistrate judge . . . where it has been shown that the magistrate judge's ruling is clearly erroneous or contrary to law."). A magistrate judge's order is "clearly erroneous" if the court has "a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *Burdick v. Comm'r IRS*, 979 F.2d 1369, 1370 (9th Cir. 1992). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law[,] or rules of

---

[7] The officers later learned that Garcia's sister is the 23-year-old female about whom Humberto made the initial 911 call.

[8] The remaining BWC footage shows the officers' pat-down of Garcia, some of Colwell's report writing, and questioning of Garcia (both before and after he was Mirandized). Because the government has indicated that it would not rely on any of the statements and the parties have agreed that the portion of the motion to suppress related to the statements is moot, I need not address that part of the footage.

procedure." *United Health Grp., Inc. v. United Healthcare, Inc.*, 2014 WL 4635882, at *1 (D. Nev. Sept. 16, 2014). In the criminal context, a "district judge must consider de novo any objection to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(3).

III.     Discussion

The Fourth Amendment of the Constitution protects "the right of the people to be secure in their persons, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Warrantless searches and seizures are per se unreasonable, "subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quoting *Thompson v. Louisiana*, 469 U.S. 17, 19–20 (1984) (per curiam) (citations omitted)). A *Terry* stop is one such exception. Derived from the seminal case of *Terry v. Ohio*, a *Terry* stop "allows an officer to briefly detain a person when the officer has reasonable suspicion that criminal activity is afoot." *United States v. Gallinger*, 227 F. Supp. 3d 1163, 1167 (D. Idaho 2017) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). "There is no bright-line rule to determine when an investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996) (citing *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988)). "Rather, in determining whether stops have turned into arrests, courts consider the 'totality of the circumstances.'" *Id.* (citing *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990) (quoting *United States v. Baron*, 860 F.2d 911, 914 (9th Cir. 1988), *cert. denied*, 490 U.S. 1040 (1989))). "As might be expected, the ultimate decision in such cases is fact-specific." *Id.*

    a.     *The officers initially conducted a Terry stop of Garcia, not an arrest.*

The threshold question is whether the officers *initially* stopped Garcia or arrested him. It is undisputed that Garcia was ultimately arrested when he was handcuffed, taken to a police vehicle, searched, and questioned. *See* ECF Nos. 68, 69 (in which the parties both repeatedly refer to an eventual "arrest"). But I must determine whether the police conduct amounted to an arrest from its inception or whether it began as a temporary detention and, at some point, transformed into an arrest. This determination affects which standard—probable cause or

reasonable suspicion—applies. Garcia contends that his "initial detention constituted an arrest for which officers lacked probable cause." ECF No. 27 at 10–11; ECF No. 68 at 6. And the government argues that the officers had reasonable suspicion to initially detain Garcia to assess his involvement in the domestic dispute and then later had probable cause to search him because he resisted the officers. ECF No. 34 at 2, 7; ECF No. 69 at 9. Because of the fact-specific nature of determining whether conduct amounts to a stop or an arrest, courts consider various factors in making such assessments. *Washington v. Lambert*, 98 F.3d at 1185–92 ("In short, we decide whether the police action constitutes a *Terry* stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances*." (citing *Del Vizo*, 918 F.2d at 824–25)). And "[w]hether we deem a particular detention a *Terry* stop or an arrest is of great importance because the decision we make will frequently determine whether the police conduct was lawful or not." *Id.* at 1185–86.

      Looking at the totality of these circumstances, it is a close call whether the officers' *initial* conduct amounted to a temporary detention or an arrest, largely because of how quickly the events transpired: within ten seconds of both officers encountering Garcia, the officers and Garcia were entangled, with Garcia on the ground and handcuffed with his wrists behind his back. ECF No. 28, Ex. C at 0:00:00–0:01:13. When Colwell first approached Garcia, his BWC was not yet on, but he testified that Garcia was standing outside the courtyard and that he told Garcia to enter it. *Id.* at 88. Colwell unequivocally testified that Garcia complied with that initial request to go in the courtyard. ECF No. 61 at 88–89.[9] While Garcia was walking just inside the courtyard, Colwell said, "Alright, stay right here. Why do you keep walking away? Stop! Stop!" ECF No. 28, Ex. C at 0:00:05–0:00:10. Colwell and Macias then grabbed Garcia's arms. *Id.* Garcia stood still at first, but both officers testified that Garcia was physically resisting them by pushing their hands away as they tried to bring his arms behind his back and by pulling away

---

[9] Q: "Going back to the beginning of the stop, you—you claim that you asked Mr. Garcia to go back into the courtyard?" A: "Yes." Q: "And he complied with that request?" A: "Yes." ECF No. 61 at 88–89.

from them. ECF No. 61 at 49, 132–34.

The government maintains that the officers initially needed to detain Garcia to assess his potential involvement in the domestic dispute related to Humberto's 911 call (and possibly the disconnected call). *See, e.g., id.* at 100. Colwell testified that when he stopped Garcia, he did not know whether Garcia was involved in the domestic dispute. *Id.* at 67. He also testified that he tried to stop Garcia "just to see if he was involved" and that "all he tried to do is walk away." *Id.* And Macias testified that he "didn't think [they] had anything on him" "when Officer Colwell started chasing him." *Id.* at 142. This supports the finding that the officers' initial intent in stopping Garcia was to question him about the domestic dispute and determine his involvement, if any. Based on their testimonies, it was not until Garcia tried to break away from the officers that they decided to physically restrain him. At no point did the officers draw their weapons, which weighs in favor of these circumstances constituting a stop, not an arrest. *See Lambert*, 98 F.3d at 1188 ("[I]f the police draw their guns[,] it greatly increases the seriousness of the stop."). And although they ultimately handcuffed Garcia—which courts have held "substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop"—they did not do so until he started physically resisting them. *Id.* (quoting *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982), *cert. denied*, 459 U.S. 1211 (1983)). While I conclude that the stop at some point eventually transformed into an arrest, I find that the initial detention was a *Terry* stop, requiring reasonable suspicion.

   b. *Law enforcement lacked reasonable suspicion to initially stop Garcia.*

Having determined that Garcia's initial detention was a *Terry* stop, the next question is whether the officers had reasonable suspicion to temporarily stop him. "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (citing *United States v. Cortez*, 449 U.S. 411, 418 (1981); *United States v. Salinas*, 940 F.2d 392, 394 (9th Cir. 1991)). "The requirement of

8

*particularized* suspicion encompasses two elements." *Id.* (citing *Cortez*, 449 U.S. at 418. "First, the assessment must be based upon the totality of the circumstances." *Id.* (citing *Cortez*, 449 U.S. at 418). "Second, that assessment must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *Id.* (citing *Cortez*, 449 U.S. at 418; *Terry*, 392 U.S. at 21 n.18 ("[t]his demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.")).

Based on the information they had at the time they stopped Garcia, the officers lacked particularized suspicion to stop him. The only proffered reasons for stopping Garcia were that they wanted to investigate how he was connected to the domestic dispute and that they were concerned he might enter an apartment and retrieve a weapon. But as Garcia points out, he bore no physical resemblance to the mid-twenties female aggressor that the officers knew from dispatch they were seeking. Humberto had provided 911 dispatch with a physical description of his niece, including the color of the clothes that she was wearing and that her skin was white. Both officers confirmed knowing that they were looking for a female aggressor, so they had no reason to believe that Garcia—a Hispanic man—was the person they were seeking.[10] Further, the officers testified that they learned in their police training that there is a correlation between holidays and domestic violence calls because holidays tend to involve large family gatherings and "when there's a lot of alcohol and emotions . . . we tend to get a lot more disturbances." ECF No. 61 at 26, 120–21. Thus, they testified that there may have been an escalating situation in the courtyard due to the arguing they heard. But there is no additional evidence or testimony as to how or why they believed Garcia might be involved in the domestic dispute, or how or why they believed Garcia had committed or was about to commit a crime. Without more, and based on the information they had at the time, the officers lacked a particularized reason to conduct the

---

[10] Macias also testified that during the encounter, the two other individuals in the courtyard were indicating in Spanish that the domestic situation was upstairs, not with Garcia in the courtyard, and that one of them indicated "not him," referring to Garcia. ECF No. 61 at 142–43. While it is true that the individuals could have been creating a distraction for the officers, their comments also weigh in my assessment of the totality of the circumstances.

*Terry* stop.

Another factor that I must weigh in my reasonable-suspicion determination is Colwell's testimony at the evidentiary hearing that he recognized Garcia when he initially encountered him on Christmas Eve. *Id.* at 37–38. Colwell said that "[a]bout a few months prior" to the incident, he saw "a bulletin with some gang members that live in our area, and [Garcia] was on that bulletin." *Id.* Colwell noted that he "kn[e]w that he was part of a criminal street gang called FTC, which is Fuck the Cops. I know from my training and experience that sometimes gang members are violent." *Id.* at 38. While this may be true, and slightly tips the scale in the government's favor, Garcia's membership in a gang, without more, is insufficient to meet the reasonable-suspicion standard.[11]

Further, the only "weapon" mentioned on the 911 calls was the can that Humberto's niece threw at him, so the officers had no reason to suspect that Garcia—or anyone at the scene—was armed with anything but a can. The officers never testified that the area they were in was a high-crime neighborhood. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing *Adams v. Williams*, 407 U.S. 143, 144, 147–48 (1972)) (noting that "the fact that [a] stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis"). The officers did not articulate that they had any reason to suspect Garcia of criminal activity or to believe that he was a danger. And at no point did the officers testify that they feared for their safety, the safety of the child Garcia was holding, or the safety of the other people in the courtyard, other than their speculation that Garcia may have been walking toward one of the apartments that could have been "filled with items that can be used as weapons against officers." ECF No. 61 at 47–48.

I defer to the officers' judgment and experience and recognize that allowing someone to enter a residence could, in some circumstances, pose dangers to officers and others in the vicinity. And while I recognize that the encounter with Garcia was dynamic, the BWC shows

---

[11] Even his gang membership coupled with him walking away is insufficient, as he was initially compliant with officers' question if they can head back into the courtyard (ECF No. 61 at 53), which was in a direction away from the officer.

that Garcia was still standing near the entrance to the courtyard when he was detained. He was not near enough to the closest lower-floor apartment that he could reasonably retrieve a weapon from it. *See* ECF No. 28, Ex. C at 0:00:00–0:01:13. Further, the fear that Garcia could have been going to retrieve a weapon is inconsistent with Colwell's testimony that Garcia initially complied with his instruction to enter the courtyard. Up until Colwell attempted to detain Garcia, he had complied with Colwell's commands. Garcia was in the courtyard—closer to the apartment building than he was at the beginning of the interaction—because Colwell had instructed him to go there.

During their testimonies, the officers did not articulate enough to demonstrate that they could meet the reasonable-suspicion burden. "[P]olice are not entitled, under the guise of *Terry*, to stop a person simply for being in the vicinity of a suspected crime." *Gallinger*, 227 F. Supp. 3d at 1169 (citing *Terry*, 392 U.S. at 29; *Wardlow*, 528 U.S. at 119). "Something more is necessary to raise suspicion that a person is the one engaged in wrongdoing. The [o]fficer must have 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *Navarette v. California*, 572 U.S. 393, 396–97 (2014). I find that particularized and objective basis lacking here. The nature of law enforcement leads officers to make split-second decisions in complicated situations, and courts must then consider such situations based on the totality of the circumstances and what the officers knew at the time—which here transpired in a matter of seconds. My decision to reject the magistrate judge's recommendation is not intended to critique the officers' decision-making in the moment, but instead seeks to protect Garcia's Fourth Amendment right, based on the record before the court. While a close call, the record demonstrates an insufficient articulation of why they decided to detain Garcia. I therefore find that they lacked reasonable suspicion to detain him. Under the particular circumstances of this case, and based on the officers' testimonies, the facts fall short of an objectively reasonable, articulable, and particularized basis for suspecting Garcia of criminal activity when he was detained. *See Gallinger*, 227 F. Supp. 3d at 1171.

   c. *The gun was the fruit of an unlawful search and must be suppressed.*

  Garcia urges me to suppress the gun because "[t]he stop was unconstitutional, and all evidence stemming from that stop must be suppressed as fruit of an illegal seizure." ECF No. 27 at 14. The government counters that the gun was found during a lawful search incident to arrest "for an independent criminal act" after Garcia "committed a separate and distinct crime of [r]esisting or [o]bstructing a [p]ublic [o]fficer." ECF No. 34 at 7–8. The government cites NRS § 199.280 as the statute that Garcia violated when he resisted the officers, and it argues that Garcia's resistance gave the officers probable cause to arrest him. *Id.* at 4, 11–14. Under that statute, "[a] person who, in any case or under any circumstances not otherwise specifically provided for, willfully resists, delays, or obstructs a public officer in discharging or attempting to discharge any legal duty of his or her office shall be punished . . . ." NRS § 199.280. But Garcia questions whether the officers were engaged in a "legal duty" when they arrested him because their initial detention of him violated his Fourth Amendment rights.

  In a recent case, one of this district's judges found that "the lawfulness of a police officer's conduct is an essential element of NRS § 199.280" and that "the lawfulness of an officer's conduct is a condition precedent to the criminalization of resisting an officer, both as a matter of common sense and from the plain meaning of the statutory text." *Brizuela v. City of Sparks*, 2022 WL 3229389, at *28 (D. Nev. Aug. 10, 2022), *appeal docketed*, No. 22-16357 (9th Cir. Sept. 9, 2022). I find that reasoning persuasive and adopt it here. Because the officers lacked reasonable suspicion to detain Garcia, they were not carrying out a lawful duty when they detained—or later, arrested—him. That element of the statute is lacking here. Garcia thus could not have committed the crime of resisting an officer, so the search that the officers performed was not incident to a lawful arrest. "It is well established that the Fourth Amendment's exclusionary rule applies to statements and evidence obtained as a product of illegal searches and seizures." *United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (en banc) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963)). Because the officers violated Garcia's Fourth Amendment right

12

against unreasonable searches and seizures, the gun must be suppressed.

Like many Fourth Amendment lawsuits, this case turns on events that transpired and decisions that were made in the span of mere seconds. The nature of law enforcement work involves making split-second decisions to act, but such actions must comply with the Constitution's guarantee of freedom from unlawful searches and seizures. And officers must articulate *particular* reasons why they sought a suspect. So based on the information that the officers had at the time they initially encountered Garcia, I find that they lacked reasonable suspicion to temporarily detain him. And because the initial stop lacked sufficient justification, the subsequent search would not have occurred but for the initial unlawful detention. The gun must therefore be suppressed as a fruit of an unlawful seizure.

## IV. Conclusion

IT IS THEREFORE ORDERED that Garcia's objection to the magistrate judge's R&R [ECF No. 68] is SUSTAINED, and the R&R [ECF No. 67] is REJECTED.

IT IS FURTHER ORDERED that Garcia's motion to suppress the firearm [ECF No. 27] is GRANTED.

DATED: January 3, 2023

_____
Cristina D. Silva
United States District Judge